UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND


Leila C. Waite,                                          )

                                                         )

            Plaintiff,                                   )

v.                                                       )    Civil Action No._____

                                                         )

U.S. SECURITIES AND EXCHANGE COMMISSION;  )
PAUL S. ATKINS, in his official capacity                 )
as Chairman of the U.S. Securities and                   )
Exchange Commission;                                     )
U.S. DEPARTMENT OF THE TREASURY;                         )
and SCOTT BESSENT,                                       )
in his official capacity as Secretary of                 )
the U.S. Department of the Treasury,                     )
                                                         )

            Defendants.                                  )


(Pro Se; Declaratory and Injunctive Relief; Rule 60 Relief)


COMPLAINT

Statement of the Case

This action challenges SEC judgments entered in a 2011 enforcement case that were never

properly served on Plaintiff yet have barred Plaintiff from working for SEC-registered firms,

effectively destroying Plaintiff's ability to earn a living in her chosen profession. Those same

judgments are now being used, without adequate notice or process, to collect debts through the

Treasury Offset Program by seizing or threatening to seize a portion of Plaintiff's only income—

her Social Security benefits. Plaintiff brings this action principally to halt those unlawful

1

Treasury offsets and to obtain appropriate relief from the void and defective judgments on which they are based.

In the 2011 case, SEC enforcement attorneys first failed to complete the agreed-upon email service of the summons and complaint, then inaccurately reported to the Court that service had been effected and later produced multiple, inconsistent forwarded emails as supposed "proof" of service. At the same time, they urged the Court to order approximately $1.8 million in disgorgement based on an estimate that exceeded the company's actual gross revenues of roughly $1.3 million for 2006–2008 and ignored undisputed net losses that flowed through to Plaintiff personally, even though there were no net profits or "ill-gotten gains" for Plaintiff to retain. These judgments, obtained without valid service and resting on demonstrably unreliable representations, are now being enforced through administrative offset without the basic notice and procedural protections required by law.

Plaintiff Leila C. Waite, proceeding pro se, alleges as follows:

PARTIES

1. Plaintiff Leila C. Waite is a 71-year-old individual who receives mail at 270 Bellevue Avenue #1019, Newport, RI 02840, and maintains substantial personal and business ties to Rhode Island.

2. Defendant U.S. Securities and Exchange Commission is an independent agency of the United States government with its principal offices in Washington, D.C.

3. Defendant Paul S. Atkins is the Chairman of the U.S. Securities and Exchange Commission and is sued in his official capacity.

2

4. Defendant U.S. Department of the Treasury is an executive department of the United States government with its principal offices in Washington, D.C.

5. Defendant Scott Bessent is the Secretary of the U.S. Department of the Treasury and is sued in his official capacity.

JURISDICTION AND VENUE

6. This action arises under the Constitution and laws of the United States, including the Fifth Amendment, the Administrative Procedure Act, 5 U.S.C. § 701 et seq., 31 U.S.C. §§ 3711(a), 3716, and is brought pursuant to Federal Rule of Civil Procedure 60.

7. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and the Court's authority to consider Rule 60 relief from its own prior judgments.

8. Venue is proper in this District because the underlying civil judgments were entered in this District and Plaintiff seeks relief from, and a stay of enforcement of, those judgments.

FACTUAL ALLEGATIONS

I. BACKGROUND AND PROCEDURAL HISTORY

9. In early 2009, the SEC filed an enforcement action in the United States District Court for the District of Rhode Island, *Securities and Exchange Commission v. Locke Capital Management, Inc. and Leila C. Jenkins*, Case No. 1:09-cv-00100-S-DLM. In or about 2011, the Court entered civil judgments for disgorgement and related relief in that case (the "2011 Action").

10. Plaintiff was never properly served with the complaint or summons in the 2011 Action. Federal Rule of Civil Procedure 4 requires proper service and proof of service for a court to obtain personal jurisdiction over a defendant. During the case, Plaintiff repeatedly raised the

3

lack-of-service issue, and the Court repeatedly questioned the SEC about proof of service. The SEC consistently represented to the Court that service of process had been completed when it had not. In July 2009, Plaintiff moved for dismissal based in part on lack of service. The Court denied that motion, apparently relying on SEC representations and purported proof of service that Plaintiff now knows to be incorrect and internally inconsistent.

11. The Court eventually directed the SEC to provide proof of service to Plaintiff. The SEC then produced a document it represented as proof of service, which on its face does not accurately reflect any service that was ever made on Plaintiff. Plaintiff was not afforded a meaningful opportunity to analyze that purported proof of service against the underlying email record and present the resulting evidence to the Court before the Court ruled against her on summary judgment.

12. Two attorneys who represented Plaintiff early in the 2011 Action submitted affidavits stating that they were never served with the summons or complaint on Plaintiff's behalf. The SEC's lead trial attorney submitted an affidavit stating that Plaintiff had not waived service. His affidavit attaches an email in which he advised Plaintiff's then-counsel that service documents were "coming shortly," yet the affidavit conspicuously omits the follow-on email the SEC later contended constituted service. No explanation was offered for this omission. An attorney purporting to provide a complete service record would ordinarily be expected to include all communications in the chain that support the claimed service.

13. Plaintiff did eventually appear in the 2011 Action, but only after the case had already proceeded without proper service. Plaintiff's later appearance did not cure the original defect in service or eliminate the prejudice caused by the SEC's failure to properly commence the action

4

against her, and it left Plaintiff defending a complex enforcement case from a materially disadvantaged position.

14. Plaintiff subsequently obtained, from the Court's electronic case filing ("CM/ECF") system, copies of the summonses and corresponding "Proof of Service" entries in the 2011 Action. On April 15, 2009, the SEC's lead trial attorney filed two summons returns (CM/ECF Nos. 2 and 3) bearing his handwriting, stating that counsel for Defendant had agreed to accept service and that delivery would be "by email." Plaintiff's then-counsel did agree that he would accept service of the summons and complaint by email, but neither he nor Plaintiff ever received an email from the SEC that actually attached the summons and complaint as promised. The April 15, 2009 filings were not available to Plaintiff until they appeared on the CM/ECF docket on or about that date.

A. Defective Service and Altered "Proof" Emails

15. Over time, the SEC and its counsel have produced three different versions of the email they contend effected service of the complaint and summons in the 2011 Action. These versions do not match each other and do not match how genuine SEC emails with attachments from that period appear when printed. A contemporaneous service email purporting to effect original service would ordinarily appear as an original message, not as a forwarded one. All three versions of the alleged "proof" of service emails, however, indicate that they were forwards of another message.

16. The first version of the purported service email, produced by the SEC during the 2011 Action, shows the supposed service documents as image thumbnails and lists the file names with ".pdf" extensions. This version contains no salutation to Plaintiff's then-counsel, and the second line of message text consists of only three words. The subject line identifies the message as a forwarded email. Other emails sent from the SEC's email system in that period, including emails

5

from the same attorney, do not print in this format; in genuine messages, attachments appear in a different, consistent way with the document names typed and without small inline thumbnail images of documents.

17. A second version of the purported service email was later provided to Plaintiff as "proof" of service. In this version, no actual attachments are present. The subject line again identifies it as a forwarded email. This version includes a salutation to Plaintiff's then-counsel by name ("Ned"), and the second line of message text contains four words, rather than the three words in the first version. SEC attorney Sevilla transmitted this version to Plaintiff on February 24, 2010. In that February 24, 2010 email that Attorney Sevilla actually sent to Plaintiff, she attached the service documents to her own message, and those attachments appear in the normal way SEC emails from this period print; they do not appear as attachments to the forwarded March 2009 email.

18. The third version of the purported service email, also produced in connection with the 2011 Action, likewise contains no attachments. In this version, the subject line again shows that it is a forwarded email, but the subject is split over two lines listing the supposed document names, instead of appearing on a single line as in the first two versions. The body of the message has a five-word second line, instead of the three-word or four-word second lines seen in the other versions and includes a salutation to Plaintiff's then-counsel ("Ned"). The attachments show again as attached to Ms. Sevilla's contemporaneous email. This second forward of the "proof" of service email, which Attorney Sevilla wrote later in the day on Wednesday, February 24, 2010 5:47 PM, has a new message in the body of the email saying it is the SEC's position that the Plaintiff and Locke were served on March 18, 2009. However, this second forward of the purported service email, now also forwarding Ms. Sevilla's earlier in the day email, shows a different timestamp for her  earlier message: it reflects an email purporting to be sent on

6

Thursday, February 25, 2010 3:50 AM. It is not possible to forward an email on February 24th that, according to its own header, had not yet been sent and would not exist until February 25th.

19. By contrast, genuine emails sent from the SEC's email system during the relevant period—including the email from SEC attorney Sevilla attaching the documents to her February 24th message—printed in a uniform and usual SEC format: attachments are displayed in the same location and style across messages, and the body text and subject line structure are stable. The three versions of the purported service email deviate from this consistent format and from each other in their treatment of attachments, subject lines, salutations, message text, and dates.

20. Plaintiff printed all three versions of the purported service email and the comparator SEC emails using the same equipment, software, and method. The differences among the three service-email versions therefore cannot be explained by Plaintiff's printing process; the printouts reflect exactly how the messages appear in the SEC discovery files. Instead, the inconsistencies in formatting, attachment display, subject line content, message text, and dates indicate that at least some of the purported service emails were created or altered after the fact and do not reflect any contemporaneous service that was actually made on Plaintiff or her counsel.

21. As a technical matter, a sent email cannot ordinarily be reopened and altered in place within the sender's email system. By contrast, when a user forwards an email, the forwarded message is a new, editable email that can be modified before it is sent. The fact that all three "service" emails appear only as forwarded messages, combined with their differing content, formatting, and dates, is consistent with emails that were created or altered after the fact rather than with a single, contemporaneous service email.

22. Plaintiff never received, at the time of the 2011 Action, any email from the SEC that both attached the summons and complaint and matched the "service" description later given to the Court. The contemporaneous affidavits submitted by her attorneys confirm that they were never served and that they had personal knowledge that Plaintiff was working from a copy of the complaint she obtained from the CM/ECF system without the Court's stamp and without the summons. The only contemporaneous email Plaintiff received in this sequence was the SEC attorney's message stating that service documents were "coming shortly," which was sent to her attorney. No email with attached service documents ever followed.

23. Plaintiff did not receive actual notice of the judgments when they were entered. Plaintiff believes, based on her recollection, that the case concluded in or about 2011. Plaintiff first learned of one of the judgments in late 2015, when she discovered a lien referencing it in connection with Florida property.

24. After learning of the lien, Plaintiff sought legal advice and began trying to understand and address the consequences of the judgments. When Defendants first acted in 2026 by causing a purported judgment debt to be referred for collection through the Treasury Offset Program, and Plaintiff then received notice from the U.S. Department of the Treasury that her Social Security benefits—Plaintiff's only personal income—would be reduced, Plaintiff acted promptly to challenge the judgments and the threatened collection by administrative offset.

25. After the SEC judgments were entered, neither the SEC nor any other agency sent Plaintiff billing statements, demand letters, or other written collection communications advising that the obligations were due, delinquent, or subject to collection. Plaintiff received no written notice that the SEC or any federal agency considered the obligations to be delinquent or intended to pursue collection, including through administrative offset or referral to the Treasury Offset Program.

26. On or about April 7, 2026, Plaintiff received a notice from the U.S. Department of the Treasury stating that Treasury would begin offsetting up to 15 percent of Plaintiff's Social Security benefits to collect a debt. It was not until April 28, 2026, after Plaintiff contacted the Treasury Offset Program ("TOP"), that she learned the debt arose from the SEC. Treasury's public materials explain that TOP collects delinquent debts owed to federal and state agencies by intercepting federal payments, including Social Security benefits.

27. Before receiving that Treasury notice, Plaintiff did not receive from the SEC written notice stating the amount and nature of the debt, the intention to collect by administrative offset, or Plaintiff's rights to inspect records, seek review, or enter into a repayment agreement, as required by 31 U.S.C. § 3716 and its implementing regulations.

28. Under 31 U.S.C. § 3711(a)(1), the head of an executive agency "shall try to collect a claim of the United States Government for money or property arising out of the activities of, or referred to, the agency" before resorting to administrative offset. The SEC never attempted to collect any debt from Plaintiff or provided notice of any judgments. Accordingly, any referral for administrative offset, and any offset under 31 U.S.C. § 3716, was premature and unauthorized because § 3716 applies only after an agency has tried to collect a claim under § 3711(a).

29. After receiving the Treasury notice, Plaintiff submitted written objections and supporting materials to the SEC's collection unit, enforcement unit, and Ombudsman. The Ombudsman replied only that it could not assist and had forwarded the papers to the Office of Legal Counsel. Plaintiff has received no meaningful process or written decision addressing her objections.

30. Despite Plaintiff's efforts to resolve these issues directly with the SEC and to follow the administrative channels identified by Treasury, the SEC has not provided any substantive

response, has not afforded Plaintiff the required pre-offset rights, and has not taken any steps to halt or review the planned offset.

II. CONSEQUENCES OF THE 2011 JUDGMENTS FOR PLAINTIFF

31. The SEC judgments in the 2011 Action did not only impose monetary disgorgement; they also included an order barring Plaintiff from working for, or associating with, SEC-registered firms. That order effectively eliminated Plaintiff's ability to continue in her chosen profession and to earn a living in the securities industry.

32. Since being barred from working for SEC-registered firms, Plaintiff has consistently attempted to rebuild a lawful livelihood, including starting a small cleaning business, working for an engineering company, and returning to school to complete all coursework toward a Ph.D. in Modeling & Simulation-Cybersecurity. Because of the SEC bar, the physical demands of non-professional work as Plaintiff has aged, and the impact of the COVID-19 pandemic, these efforts have not produced a stable income.

33. Plaintiff is now actively working to build a technology company that is registered in multiple states for grant and compliance purposes, but this venture remains pre-revenue and has not yet generated any grant funding or personal income for Plaintiff.

   A. Disgorgement, Revenues, and Lack of Net Profits

34. The SEC enforcement action and its aftermath have also contributed to Plaintiff's current disability. Plaintiff has a history of traumatic brain injuries and post-concussion symptoms dating back to 1997 and, during the SEC lawsuit, experienced recurring migraines and severe vertigo that made it extremely difficult to participate in and defend the case. Those symptoms returned and became persistent in early 2023, while Plaintiff was completing demanding Ph.D.

10

coursework, and have since made it very hard for Plaintiff to work in any consistent way. As a result, despite sustained efforts to rebuild a livelihood, Plaintiff's health limitations make her life very difficult. Plaintiff depends on Social Security benefits as her only reliable personal income, making any offset of those benefits especially harmful.

35. During the period of alleged wrongdoing underlying the 2011 Action, 2006–2008, Plaintiff did not receive compensation or profits from the company. Any compensation was paid to other individuals who worked in the business, not to Plaintiff. Plaintiff was instead investing in the company and its employees during this period. Because the company was not operating in profit, she took out a home equity loan on her primary residence in Florida to cover company expenses, based on the then-reasonable expectation that rapidly expanding revenues would allow repayment.

36. In addition to misrepresenting service, the SEC materially overstated the amount of disgorgement it sought. For the 2006–2008 period at issue, the SEC represented to the Court that approximately $1.8 million in revenues should be disgorged, even though the company's actual gross revenues for that period were approximately $1.3 million. The company, an S-corporation, never earned a profit during those years; all profits and losses flowed through to Plaintiff personally, and those years generated approximately $1.35 million in losses for Plaintiff. There were no net profits or "ill-gotten gains" to disgorge. The SEC's figures were not derived from the company's actual books and records, but from an unsupported estimate that overstated gross revenues by roughly $500,000 and ignored the company's net losses. Moreover, there were no harmed investors to whom any funds could be returned; there was never any allegation that client funds were missing, misappropriated, or lost, and no investor restitution was required or ordered.

11

37. During the years in question, 2006–2008, Locke Capital Management, Inc. operated at a significant net loss. Its operating expenses and other legitimate business costs exceeded its approximately $1.3 million in gross revenues, and, as an S corporation, those losses flowed through to Plaintiff's personal tax returns, resulting in negative personal income of approximately $1,350,491 during this period. Plaintiff covered the shortfall by drawing on a home-equity loan on her primary residence in Florida. Once the SEC began its investigation, all clients departed within roughly two weeks and the company never had any income again. Plaintiff ultimately lost her home because she had no income to service the loan that had financed the business losses during the years she was investing in the company and its employees. Before the investigation, the company had been on track to swing into profit in 2009.

38. Plaintiff also held multiple NASD/FINRA and NASAA licenses and had previously owned SEC-registered broker-dealers. For many years, the Swiss client at issue paid in soft dollars to whatever broker-dealer Plaintiff was affiliated with. Plaintiff held general and principal licenses including Series 3, 7, 8, 24, 27, 53, 63, and 65, and was in the process of moving her licenses to a new broker-dealer when the SEC began its investigation. That new broker-dealer then dropped her; the two-year period for keeping her licenses active lapsed; and the SEC bar preventing her from working for or associating with SEC-registered firms permanently blocked her ability to earn a living both as an investment adviser and as an owner or principal of broker-dealers.

39. The SEC's allegations and judgments also caused severe reputational harm. Press coverage of the 2011 Action reported that Plaintiff had "invented a client," and members of the public and professional community repeatedly asked Plaintiff "what did you do with all the money you stole?," even though there was never any allegation of missing money or that Plaintiff stole funds, misappropriated assets, or provided substandard investment performance. The client at

12

issue was a sub-advisory client whom Plaintiff visited periodically in Switzerland and that was subject to different compliance rules than ordinary advisory clients.

40. These public accusations and misunderstandings further damaged Plaintiff's reputation and made it effectively impossible for Plaintiff to work again in the securities industry, compounding the harm from the SEC's bar. The judgments and their fallout also caused collateral community consequences, including Plaintiff's resignation from a prominent yacht club where she had been a frequent volunteer after being told that her resignation was expected in light of the default judgment against her company. This occurred a year before there was any decision about her personal actions. Although important to Plaintiff, these collateral harms are secondary to the central injury: the deprivation of Plaintiff's ability to work in her profession, the loss of her home, and the resulting need to rely solely on Social Security income.

41. As a result, Plaintiff now faces an imminent and ongoing deprivation of her only reliable income through administrative offsets of her Social Security benefits based on the 2011 judgments, without ever having been properly served in that action or afforded the required pre-offset procedures. This complaint seeks to prevent those offsets and to remedy the underlying defects that led to the judgments.

42. Because the 2011 Action was never properly served and service was inaccurately recorded and misrepresented, any judgments entered in that case are void for lack of personal jurisdiction, or, at minimum, should be vacated or set aside.

43. After eventually learning of the 2011 Action, Plaintiff appeared pro se and repeatedly informed the Court that she had never been properly served with the summons and complaint.

13

Plaintiff raised the lack-of-service issue at each appearance and did not abandon or waive the objection.

44. Despite Plaintiff's objections, SEC counsel continued to represent to the Court that service had been properly effected, and the magistrate judge later issued a written statement or order reflecting that Plaintiff had been served. Plaintiff did not receive that document at the time and learned of it only years later, in early 2016, when a consulting attorney reviewed the docket after Plaintiff discovered the lien.

III. CLAIMS FOR RELIEF

COUNT I

Relief From Judgment Under Rule 60(b)(4) – Void Judgment

(A) Void Judgments for Lack of Personal Jurisdiction

45. Plaintiff repeats and realleges paragraphs 1 through 44 as if fully set forth herein.

46. Under Federal Rule of Civil Procedure 60(b)(4), a court may relieve a party from a judgment if the judgment is void, including where the court lacked personal jurisdiction or the judgment was entered in a manner inconsistent with due process.

47. Plaintiff was never properly served with the summons and complaint in the 2011 Action, and service was inaccurately recorded and later misrepresented to the Court. Plaintiff's then-counsel agreed that he would accept service of the summons and complaint by email. The SEC's lead trial attorney thereafter filed summons returns stating, in his handwriting, that counsel for Defendant had agreed to accept service and "delivery by email." In fact, no email was ever sent to Plaintiff or her counsel that actually attached the summons and complaint, and neither Plaintiff nor her counsel ever received such an email.

14

48. Federal Rule of Civil Procedure 4 requires proper service of process as a prerequisite to the exercise of personal jurisdiction over a defendant.[1] The SEC never completed the agreed-upon email service and never effected service by any other authorized means. As alleged in detail above, the SEC and its counsel later produced multiple inconsistent versions of the email they claimed effected service, none of which reflects a contemporaneous email that actually attached the summons and complaint. The SEC's lead trial attorney's own affidavit attaches only an email stating that service documents were "coming shortly" and omits any follow-up email with attachments.

49. Notwithstanding the absence of valid service, the Court in the 2011 Action entered a default judgment against the corporate defendant and later granted summary judgment against Plaintiff personally. At the time of summary judgment, Plaintiff had appeared pro se and submitted an opposition identifying disputed issues of material fact, but the Court proceeded on the premise—based on SEC representations and defective "proof of service"—that service had been properly effected and that the Court had personal jurisdiction over both defendants. Because neither defendant was brought before the Court by valid service of process, the Court lacked a proper basis for exercising personal jurisdiction, and the resulting judgments are void and should be vacated under Rule 60(b)(4).[2]

50. As further detailed in paragraphs 34–36, the judgments entered without proper service also rested on materially inaccurate SEC submissions concerning disgorgement. The SEC urged the Court to order disgorgement of approximately $1.8 million in purported revenues for 2006–2008,

---

[1] Fed. R. Civ. P. 4.
[2] Fed. R. Civ. P. 60(b)(4); *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 271 (2010) (Rule 60(b)(4) applies in the 'rare instance' where a judgment is premised on a jurisdictional defect or on a violation of due process that deprives a party of notice or the opportunity to be heard).

15

even though the company's actual gross revenues for that period were approximately $1.3 million, the company operated at a net loss that flowed through to Plaintiff personally. Those years generated substantial tax losses rather than any "ill-gotten gains" or net profits for Plaintiff to retain. The SEC's figures were not derived from the company's actual books and records and ignored undisputed net losses. Although these defects do not replace the jurisdictional problem, they underscore that the void judgment now at issue was obtained on the basis of demonstrably unreliable representations and that leaving it in place would perpetuate a serious injustice.

51. This challenge has been brought within a reasonable time under the circumstances. Plaintiff was never properly served with the summons and complaint and did not receive formal notice of entry of any judgment. Years later, in or about late 2015, Plaintiff independently discovered a lien referencing one of the judgments in connection with Florida property, but Defendants provided no accompanying explanation, no copies of the pleadings, and no collection or delinquency notices for more than a decade. Only in 2026 did Defendants take their first concrete enforcement action by causing the purported judgment debt to be referred for collection through the Treasury Offset Program, and Plaintiff first received notice from the U.S. Department of the Treasury that up to 15 percent of her Social Security benefits—Plaintiff's only reliable personal income—would be offset beginning in June 2026. Plaintiff acted promptly thereafter to challenge the judgments and the threatened collection by administrative offset.

52. Rule 60(c)(1) requires that motions under Rule 60(b)(4) be made within a "reasonable time." In assessing what is reasonable, courts consider when the movant had notice of the judgment and of enforcement efforts or other communications that reasonably alerted the movant to the judgment and its consequences. In light of Plaintiff's lack of proper service, her delayed discovery of the judgment through a lien search, the absence of any collection activity for many

16

years, and the fact that Defendants first sought to enforce the judgment against Plaintiff's Social Security benefits only in 2026, Plaintiff's request for relief from the 2011 judgments is timely under Rule 60(c)(1).[3]

COUNT II

Relief Under Rule 60(b)(3) – Fraud, Misrepresentation, or Misconduct

(B) Fraud, Misrepresentation, and Misconduct Regarding Service

53. Plaintiff repeats and realleges paragraphs 1 through 52 as if fully set forth herein.

54. Federal Rule of Civil Procedure 60(b)(3) authorizes relief from a final judgment where an adverse party has engaged in "fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct" that prevented the moving party from fully and fairly presenting her case.

55. As alleged above, Plaintiff's then-counsel agreed with the SEC's lead trial attorney that he would accept service of the summons and complaint by email. The SEC attorney then filed summons returns stating, in his handwriting, that counsel for Defendant had agreed to accept service and that delivery would be "by email." Internally, that attorney sent an email to Plaintiff's former counsel stating that service documents were "coming shortly" by email. No follow-up email was ever sent that actually attached the summons and complaint, and neither Plaintiff nor her counsel ever received such an email.

---

[3] Fed. R. Civ. P. 60(c)(1); *Coney Island Auto Parts Unlimited, Inc. v. Burton*, No. 24-808, slip op. at 5–7 (U.S. Jan. 20, 2026) (holding that Rule 60(c)(1)'s 'reasonable time' requirement applies to motions under Rule 60(b)(4) and that arguments about notice are addressed through that standard).

56. After the lead SEC attorney left the case, subsequent SEC counsel repeatedly represented to the Court that service had been properly effected, despite the absence of any valid proof of service showing that the summons and complaint were actually transmitted to Plaintiff or her counsel. The SEC did not candidly disclose that no contemporaneous email attaching the summons and complaint existed.

57. When the Court later directed the SEC to produce proof of service, the SEC produced only the original "service is coming shortly" email, which had no complaint or summons attached. Attorney Huntington then transmitted what he described as "the actual email stored in our correspondence file," which was the first version of the purported service email. Attorney Sevilla later sent Plaintiff a second version as part of a new email in February 2010, forwarding the original purported service message but attaching the complaint and summons only to her new 2010 email. Still later on February 24, 2010, Attorney Sevilla sent a third version of the purported service email and asserted that, in the SEC's view, Plaintiff had been "served" as of the date of the earlier, attachment-less message from 2009. In this third version, the email string now showed the earlier-in-the-day forward as having been sent on Thursday, February 25, 2010 at 3:50 a.m., even though that date and time were in the future when she sent her February 24 email. Over time, the SEC and its counsel thus produced multiple inconsistent versions of the same purported service email, none of which reflects a contemporaneous email that actually attached the summons and complaint, and at least some of which appear to have been created or altered after the fact.

58. These actions and omissions—filing summons returns that asserted email service had been effected when no such service email was ever sent, failing to disclose the absence of any contemporaneous service email with attachments, and presenting internally inconsistent

18

"service" emails as proof of service—constitute misrepresentation and misconduct by an adverse party within the meaning of Rule 60(b)(3). This misconduct materially prejudiced Plaintiff's ability to understand the claims, obtain timely counsel, conduct discovery, and fairly defend the 2011 Action and. It also led the magistrate judge to conclude, based on SEC assurances rather than valid proof of service, that Plaintiff had been properly served despite her repeated objections.

59. SEC enforcement counsel are government attorneys and officers of the court who are required to adhere to the highest standards of candor and honesty in their representations to tribunals. By filing summons returns asserting that email service had been effected when no such service email was ever sent, failing to disclose the absence of any contemporaneous service email with attachments, and later presenting internally inconsistent and apparently altered "service" emails as proof of service in response to the Court's inquiries, SEC counsel did not merely make innocent procedural mistakes; they engaged in conduct that violated these professional obligations and misled the Court about a jurisdictional prerequisite to the action.

60. In light of this fraud, misrepresentation, and misconduct, the judgments in the 2011 Action should be vacated or set aside under Rule 60(b)(3).

COUNT III

Violation of 31 U.S.C. §§ 3711(a), 3716 and Implementing Regulations

(C) Statutory Violations in Referring Debts for Administrative Offset

61. Plaintiff repeats and realleges paragraphs 1 through 60 as if fully set forth herein.

62. Before collecting a debt by administrative offset, a federal agency must comply with the statutory prerequisites set forth in 31 U.S.C. §§ 3711(a) and 3716 and their implementing

19

regulations, including: providing written notice of the debt and the agency's intention to collect by administrative offset; providing an opportunity to inspect and copy records relating to the debt; providing an opportunity for review of the debt determination; and providing an opportunity to enter into a written repayment agreement.[4]

63. Under 31 U.S.C. § 3711(a)(1), the head of an executive agency "shall try to collect a claim of the United States Government for money or property arising out of the activities of, or referred to, the agency" before resorting to administrative offset under 31 U.S.C. § 3716. Section 3716 authorizes administrative offset only after such collection efforts have been made and after the debtor has been afforded the required notices and opportunities.

64. After entry of the SEC judgments, neither the SEC nor any other federal agency sent Plaintiff billing statements, demand letters, or other written collection communications advising that any obligation was due, delinquent, or subject to collection, and Plaintiff received no written notice that the SEC or any federal agency considered the obligations delinquent or intended to pursue collection, including through administrative offset or referral to the Treasury Offset Program. Plaintiff likewise did not receive written notice from the SEC stating the amount and nature of the debt, the intention to collect by administrative offset, or Plaintiff's rights to inspect records, seek review, or enter into a repayment agreement.

65. Notwithstanding the absence of any prior collection efforts or required notices, Defendants initiated or caused the initiation of administrative offset of Plaintiff's Social Security benefits by referring or certifying a purported judgment debt to the Treasury Offset Program. Defendants did

---

[4] 31 U.S.C. §§ 3711(a), 3716.

20

so without first trying to collect any debt from Plaintiff as required by 31 U.S.C. § 3711(a), and without providing Plaintiff the notices, opportunities for review, and other procedural protections required by 31 U.S.C. § 3716 and its implementing regulations.

66. Defendants' actions therefore violate 31 U.S.C. §§ 3711(a) and 3716 and their implementing regulations and have resulted in an unlawful referral and attempted collection of a purported judgment debt through administrative offset, with threatens seizure of Plaintiff's Social Security benefits without the procedures required by law.

COUNT IV

Violation of the Fifth Amendment Due Process Clause**

(D) Deprivation of Property Without Due Process of Law

67. Plaintiff repeats and realleges paragraphs 1 through 66 as if fully set forth herein.

68. The Fifth Amendment prohibits the federal government from depriving any person of property without due process of law.

Lack of proper service and impaired ability to defend

69. Plaintiff and Plaintiff's company were named as defendants in the 2011 Action, but Plaintiff was never properly served with the summons and complaint as required by law. Plaintiff's then-counsel agreed to accept service of the summons and complaint by email, but no email was ever sent that actually attached the summons and complaint, and neither Plaintiff nor her counsel ever received such an email. Plaintiff did eventually appear, but only after the case had already proceeded without proper service. Plaintiff's later appearance did not cure the original defect in service or eliminate the prejudice caused by the government's failure to commence the action

21

through proper service at the outset. She repeatedly asked about service but it took nearly a year before the three versions of the "proof" of service emails were sent to her causing her to understand that service had in fact never happened.

70. Plaintiff's company was also named as a defendant. Because the company could appear only through licensed counsel, and because Plaintiff was unable, despite extensive efforts, to secure and fund long-term representation for the company, the company was defaulted early in the case. The combination of defective service, default of the company, and Plaintiff's later pro se appearance left Plaintiff defending a complex enforcement action from a severely disadvantaged position.

No notice of judgments

71. The Court in the 2011 Action ultimately entered judgments against Plaintiff and Plaintiff's company, but Plaintiff never received notice or service of any judgment, order, or other final disposition addressed to Plaintiff or to the company. Neither the Court nor the SEC ever sent Plaintiff a copy of any judgment or any written explanation of the judgments' basis or amounts. Plaintiff first learned of one of the judgments years later, in or about late 2015, when she discovered a lien recorded in her name, and she has never been provided a complete copy of the judgments together with an explanation of their basis and amounts.

No pre-collection efforts or notice of delinquency

72. After the SEC judgments were entered, neither the SEC nor any other agency sent Plaintiff billing statements, demand letters, or other written collection communications advising that the obligations were due, delinquent, or subject to collection. Plaintiff received no written notice that the SEC or any federal agency considered the obligations delinquent or intended to pursue

22

collection, including through administrative offset or referral to the Treasury Offset Program. Although TOP later sent notices using address information supplied by the SEC for collection purposes, the SEC itself never used that address information to provide Plaintiff with advance notice of the judgments or a meaningful opportunity to contest the asserted debts.

Opaque Treasury Offset Program collection on two debts

73. On or about April 7, 2026, Plaintiff received a notice from the U.S. Department of the Treasury stating that it would begin offsetting up to 15 percent of Plaintiff's Social Security benefits in June 2026 to collect a debt. On or about April 28, 2026, Treasury responded to Plaintiff's inquiry and stated that the debt arose from the SEC. Treasury's public materials explain that the Treasury Offset Program ("TOP") collects delinquent debts owed to federal and state agencies by intercepting federal payments, including Social Security benefits.

74. When Plaintiff called TOP's automated phone system and entered her Social Security number, the system stated that the government was attempting to collect two debts arising from the SEC enforcement action. Plaintiff has never received written notice explaining what those two debts are, how they were calculated, which judgments they correspond to, or what rights she has to contest the existence or amount of each debt. Plaintiff has never been provided an opportunity, before or after referral to Treasury, to inspect and copy the records underlying the debts, to present evidence and arguments challenging liability or amounts, or to obtain written decisions addressing her objections.

Deprivation of property without due process

75. By causing a purported judgment debt to be referred for collection through the Treasury Offset Program so that the U.S. Department of the Treasury has notified Plaintiff that her Social

Security benefits will be reduced based on judgments for which Plaintiff was never properly served, never received notice, never received pre-collection notice, and has never received a meaningful explanation or opportunity to be heard, Defendants are depriving Plaintiff of property without due process of law, in violation of the Fifth Amendment. Given Plaintiff's disability and reliance on Social Security as her only reliable personal income, the loss or threatened loss of those benefits through administrative offset inflicts a particularly severe deprivation of her protected interests.

76. Plaintiff is entitled to declaratory and injunctive relief, including: (a) a permanent injunction prohibiting Defendants from initiating or continuing any offset of Plaintiff's Social Security benefits, or otherwise collecting from Plaintiff through TOP, based on the 2011 Action or any debts purportedly arising from that action; (b) a declaration that Defendants' referral and collection of any SEC-related judgment debts through TOP, based on the 2011 Action and the gross-revenue disgorgement judgments entered therein, without proper service, notice of judgment, and pre-offset process, violates the Due Process Clause; and (c) such further relief as the Court deems just and proper.

COUNT V

Administrative Procedure Act – Unlawful Agency Action (5 U.S.C. § 706)

(E) Arbitrary and Unlawful Agency Action Under the APA

77. Plaintiff repeats and realleges paragraphs 1 through 76 as if fully set forth herein.

78. Under 5 U.S.C. § 706, this Court must hold unlawful and set aside agency action that is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, contrary to constitutional right, or taken without observance of procedure required by law.[5]

79. Despite having Plaintiff's correct address during and after the 2011 Action and later obtaining updated addresses through Plaintiff's tax records, neither the Court nor the SEC provided Plaintiff with copies of the judgments, delinquency notices, or any other collection communications directed to her. The first concrete enforcement effort directed to Plaintiff's current address occurred in 2026, when the U.S. Department of the Treasury sent a notice of impending offset of Plaintiff's Social Security benefits after the SEC referred the alleged debt to the Treasury Offset Program, and Plaintiff acted promptly thereafter.

80. Defendants have had accurate address information for Plaintiff from 2009 through the present. During the 2011 Action, the Court successfully mailed orders and other case documents to Plaintiff at her correct address, and Plaintiff received them. In or about 2015, a lien related to the SEC judgments was recorded listing Plaintiff's correct address. Most recently, in connection with the referral of the alleged debt to the Treasury Offset Program, correspondence concerning the offset was again sent to Plaintiff at her current address. These facts demonstrate that Defendants either had, or with minimal diligence could have obtained, Plaintiff's correct address throughout the relevant period, yet failed to provide the notices and opportunities to contest required before initiating collection via the Treasury Offset Program.

81. Defendants' decision to refer and collect SEC-related debts from Plaintiff by administrative offset, without proper service of the underlying enforcement action, without notice of the

---

[5] 5 U.S.C. § 706(2).

resulting judgments, without any prior collection efforts under 31 U.S.C. § 3711(a), and without providing the notices and opportunities required by 31 U.S.C. § 3716 and its implementing regulations, is not in accordance with law and was taken without observance of procedure required by law.

82. Defendants' continued enforcement of disgorgement judgments calculated on gross revenues rather than on any net profits, without deducting legitimate expenses or recognizing that Plaintiff personally received no profits, is contrary to law and an abuse of discretion in light of governing limitations on SEC disgorgement and the requirement that such relief be reasonably limited to a wrongdoer's net profits, if any. In Plaintiff's case, the SEC sought approximately $1.8 million in disgorgement based on an estimate that exceeded the company's actual gross revenues of roughly $1.3 million for the relevant period and ignored undisputed net losses, effectively treating an overstated gross-revenues figure as personal gains to be disgorged, with no regard for whether any net profits were ever earned. In addition, there are no identified harmed investors to whom any purported disgorgement could be returned; no client funds were missing or misappropriated, so enforcing gross-revenue "disgorgement" here serves no equitable purpose of restoring losses to investors and instead functions solely as a punitive assessment.[6]

83. Defendants have never provided Plaintiff with proper service of the underlying enforcement action, formal notice of entry of the resulting judgments, or any clear written notice that any judgment debt was delinquent or subject to collection. They did not attempt ordinary collection or provide any opportunity to resolve or contest any alleged delinquency for more than a decade. Instead, they are now moving to collect through administrative offset by seizing a portion of

---

[6] *Liu v. SEC*, 140 S. Ct. 1936, 1940–41 (2020) (disgorgement must be limited to net profits and deduct legitimate expenses).

Plaintiff's only income and enforcing a bar that prevents her from working in her profession, without first providing the notice, access to records, and pre-offset procedures required by statute and regulation. Taken together, this course of conduct is arbitrary and capricious, contrary to constitutional right, and not in accordance with law.

84. For these reasons, Defendants' referral and collection actions, and their continued enforcement of the challenged judgments and bar as applied to Plaintiff, constitute unlawful agency action under 5 U.S.C. § 706 that should be held unlawful and set aside, and Defendants should be enjoined from using the Treasury Offset Program or any similar administrative offset to collect on the 2011 judgments.[7]

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

A. Issue a temporary restraining order, preliminary injunction, and, as appropriate, permanent injunctive relief prohibiting Defendants from offsetting any portion of Plaintiff's Social Security benefits or other federal payments, or otherwise collecting, enforcing, or executing on the civil judgments entered in *Securities and Exchange Commission v. Locke Capital Management, Inc. and Leila C. Jenkins*, Case No. 1:09-cv-00100-S-DLM, including through the Treasury Offset Program, pending resolution of this action and further order of the Court.

B. Enter an order under Federal Rule of Civil Procedure 60(b)(4) vacating as void the default judgment entered against Locke Capital Management, Inc. and the summary judgment entered against Plaintiff in *Securities and Exchange Commission v. Locke Capital Management, Inc. and*

---

[7] 5 U.S.C. § 706(2).

27

*Leila C. Jenkins*, Case No. 1:09-cv-00100-S-DLM, for lack of proper service and personal jurisdiction.

C. Alternatively, grant relief from those judgments under Federal Rule of Civil Procedure 60, including under Rule 60(b)(3), Rule 60(b)(4), and, if appropriate, Rule 60(b)(6), and award such vacatur, modification, or other relief as justice requires.

D. Declare that Defendants' attempted and threatened collection from Plaintiff by administrative offset, without the notice, access to records, and opportunities for review required by law, violates 31 U.S.C. §§ 3711(a) and 3716, the Administrative Procedure Act, 5 U.S.C. § 701 et seq., and the Due Process Clause of the Fifth Amendment.

E. Declare that any bar or restriction imposed by the SEC judgments that prevents Plaintiff from working for or associating with SEC-registered entities is unlawful and unenforceable as to Plaintiff because it was entered and maintained without proper service, adequate notice, or a meaningful opportunity to be heard, in violation of the Fifth Amendment and the Administrative Procedure Act.

F. Declare that the disgorgement judgments entered against Plaintiff and Locke Capital Management, Inc. are unenforceable as to Plaintiff and Locke Capital Management, Inc. because they were calculated on the basis of gross revenues rather than any net profits, without deducting legitimate expenses or recognizing that neither Plaintiff nor Locke Capital Management, Inc. received net profits from the conduct at issue; and further declare that any monetary relief imposed against Plaintiff or Locke Capital Management, Inc. in any enforcement action must, consistent with governing law, be reasonably limited to net profits, if any, actually received by that defendant, rather than gross revenues. Plaintiff alleges that neither she nor Locke Capital

28

Management, Inc. ever realized any net profits from the revenues at issue, so any lawfully calculated disgorgement against them would be zero. There were no harmed investors to whom any funds could be returned; there was never any allegation that client funds were missing, misappropriated, or lost, and no investor restitution was required or ordered.

G. Hold unlawful and set aside, under 5 U.S.C. § 706, Defendants' referral and collection actions through the Treasury Offset Program and their continued enforcement, as applied to Plaintiff, of the 2011 judgments and any associated bars or restrictions imposed on Plaintiff or Locke Capital Management, Inc. in that action.

H. Stay all enforcement and collection activity on the 2011 judgments, including any current or future offsets through the Treasury Offset Program based on those judgments, pending resolution of Plaintiff's claims in this action.

I. Grant such other and further relief as the Court deems just and proper.

Dated: May 31, 2026

Respectfully submitted,

_____

Leila C. Waite

270 Bellevue Ave. #1019, Newport, RI 02840

+1 917 287 0699

lcw650@gmail.com

Plaintiff Pro Se

29